And will you call the first case please? 311-0144, Consolidated 311-0151, Hardy Fuel Oil Company, et al. and Linsby-Rotherham Continent v. Board of Trustees of the Village of Forest View, et al. Announced by Paul Burks and Tim Burks. Mr. Burks? Good morning. My name is Paul Burks. I'm an Assistant Attorney General and I am representing the Defendant Appellants Brian Hamer, the Director of the Department of Revenue, and Dan Rutherford, the Illinois State Treasurer. I have co-counsel today, Tim Burchie, and he will be speaking on behalf of the intervener appellants, which are the local taxing jurisdictions, the Village of Forest View, the County of Cook, and the Regional Transportation Authority. And we'll be splitting our time evenly, ten minutes apiece. I've informed your clerk of that. As to the substance of the divided argument, the case involves the proper taxing jurisdiction for Hartley's sale of fuel oil, and Hartley's sold through two different mechanisms, daily purchase orders and long-term contracts. And I will be discussing mostly, principally, the daily purchase orders, and Mr. Burchie will deal more with the long-term contract sales. So in this case, Hartley Fuel Oil Company filed its tax return and it paid the retailer's occupation tax that was applicable to retailers located in the Village of Mark in Putnam County. And the department audited them and concluded that they should have paid the retailer's occupation tax for the Village of Forest View because their business was located there. And the retailer's occupation tax is an occupation tax. It's a tax on the occupation of selling at retail and not on sales in particular. And we think that that's critical because what the auditor was doing in the audit was trying to determine where is Hartley engaged in the occupation of selling at retail. And under long-standing case law, what that means is where was Hartley located? Where was its business located when it engaged in these sales? And the Retailer Occupation Tax Act, the language engaged in the business of selling, has been in the tax statutes for decades and decades, and there's plenty of case law interpreting the meaning of that phrase. And it unanimously holds, it consistently holds, that it means the location of the retailer, not the location of the sale. And why is that? Why does the state not tax sales, but instead taxes retailers or allows the local jurisdiction to tax the retailers? And it's because the underlying purpose of the Retailer Occupation Tax is so that the local jurisdictions that are providing infrastructure and services and police and fire and education for the workforce and what have you that enable a business to thrive in a particular location can recoup the cost of those services from those who benefit from them. So the critical inquiry is where is this retailer benefiting from the services and the infrastructure? Which local jurisdiction is providing those services to this retailer? Where is it located? Where is it engaged in the occupation of selling? And what the court, so what the auditor was looking to is to determine that place, that location, and how do you do that? Well, again, there is long-standing case law. How do you determine the location of a retailer? The XLO case from 1943 said we can't come up with a bright line rule that's going to apply to every retailer as to where its location is, because every retailer operates differently, organizes its business differently in order to be successful. What works for one retailer to be located in a certain way isn't going to work for another. So what you have to do is apply that statutory language on a case-by-case basis to the retailer and see how it is that they operate their business. So you've got the statutory language, the occupation of selling at retail. You've got XLO talking about what that statutory language means and how you apply it. And you've also got the department's regulation, which it promulgated to implement the Retailer's Occupation Tax Act. And that regulation has three parts. And there's essentially three regulations, each for one local taxing county. And part of that, of the department's regulation, says pretty much what XLO Corp. says. It says that enough of the selling activity must occur within the taxing county, the home rule county, to justify concluding that the seller is engaged in business there, to justify concluding that the seller is located there. That's what the regulation is implementing, the statute, and it's using language substantially identical to what the cases have said. You have to have enough selling activity in this location. Now, part two, which is where a lot of our dispute centers, part two of the regulation talks about what selling activity is going to be considered, what selling activity is important. But what part two says, and it's intended to give guidance to taxpayers to allow them to order their affairs in a way where they'll be knowledgeable about what their tax burden will be. But it starts out by saying, look, consistent, again, with XLO Corp., with the Illinois Supreme Court's understanding of what an occupation tax is, the regulation says, without attempting to anticipate every kind of fact situation that may arise in this connection, it is department's opinion that, in general, the acceptance of the purchase order is the single most important. But it does recognize for the taxpayer that this is one factor that we're going to look at, and we do consider it important. What selling activities take place in Forest View? In this case, essentially the entire business takes place in Forest View. The selling, which selling activities? Yes, Your Honor. I'm sorry. All of the prices are set in Forest View. The solicitations are sent out from Forest View. The customers are secured by Peter Hartney, who they move out of the Forest View facility. All the employees who deal with sales in any way, shape, or form, the employees of Hartney, they work in Forest View. So if you consider selling using the XLO Corp.'s assessment of how a retailer operates from the getting of goods to the delivery of goods and how do you sell them, all of that activity is taking place in Forest View. What's taking place in Mark, there's no employees there. There's no facility there. There's Putnam County Painting, which is a painting business, and Putnam County Painting has leased 200 square feet where Hartney can keep some files, and Putnam County Painting is allowing one of its employees to answer the phone on behalf of Hartney and receive orders from Hartney's customers at that location in Mark, and then fax those orders to Forest View for them to Forest View where they can then be fulfilled, delivered. So there's no employees. There's no facility. Well, wait a minute. Who's the guy that's answering the phone? What's he? Well, the person who's answering the phone initially when the auditor asked what's that person's title, the answer was order taker, right? Well, even though he's an order taker, he's still an employee, isn't he? In this circumstance, the way they structured the relationship, she is an employee of Putnam County Painting, and then Putnam County Painting has a contract with Hartney where Putnam County Painting says we will make our employee available to do this service for you. So what I was saying is she's not an employee of Hartney, and she's clearly not an employee of Hartney. She's an employee of Putnam County Painting, and Putnam County Painting is an agent for the receipt of the orders, and she works for Putnam County Painting, so she's an agent of an agent, and her conduct would be traceable back to Hartney. How does the situation in Mark differ from the situation that Hartney had in LaSalle County? Well, in LaSalle County, the testimony of exactly the same way that they had in LaSalle County, and the department never audited the Hartney while it was engaged in that business in LaSalle County. It visited Hartney and it visited its agent in LaSalle County, but there was never a formal audit done, so there wasn't any evidence in the record as to the reason for that is largely because under the well-established case law in this district, the prior audits simply can't, or the prior conduct of the department with respect to any individual taxpayer will never stop the department from properly enforcing the statute in a given case. So when we're done with an audit, or in this case, not an audit, just an inquiry, those documents aren't always preserved. They're only preserved for a limited amount of time. So I will say that the evidence in the record from Peter Hartney is that they did it the same way. Let me just ask you, there seems to be a lot of concentration about the fact that this Well, if the selling activity still took place in Forest View, then it would be Forest View where they're located, and Forest View where they would pay the tax. I mean, it's not a question of where it is, it's a question of... But did a rented office space in Chicago and had a sales agent there if they had it in the city? Would you make the same argument? I think so, because the business was still running, they were still using the services of Forest View, even if they had one person in an office, regardless of where that person is located. It's not an employee, it's not their facility, and they're not using the services of that particular location. Now, if it was in Duluth, Cook County wouldn't be an intervener, nor would the Regional Transportation Authority, because they'd be getting their taxes anyway, and only Forest View would really be complaining. But, I mean, it comes down to what are they doing, not where are they. And in fact, in 2008, Hardening Fuel Oil Company moved their operations from Forest View out to Mark, and now they operate in Mark, and the department doesn't object to the fact that they're a Mark, Illinois, fuel retailer at this point, because they had moved their operations there, and that's where they're conducting their business. But in 2005 to 2007, they were conducting their business in Forest View. They just had their orders being sort of passed through from Mark right on back to the Forest View office. Mr. Burke, just one more question. You said that there hadn't been any audits done. Maybe I misread the stuff that we were going through. There was a lot of it. I thought that there had been audits, but they'd been destroyed. That is correct. And if I'm incorrect, I will definitely correct the record about LaSalle County, and my understanding was that an audit wasn't done on that particular instance when they were operating out of LaSalle County. But there was an audit done during an earlier period of time when they were operating out of a different county, and that audit had been destroyed, and the court applied an adverse inference against the department because we didn't really have any information about that audit anymore as to what the findings were, what the investigation was. So Peter Hartney's testimony essentially stood undisputed in that particular audit. So I might be wrong. There might have been an additional audit, and there were prior audits. You're absolutely right about that, and there certainly was one, I believe, when they were in DuPage County. Thank you. Thank you. Mr. Birchie. Good morning. Tim Birchie is my name, and may it please the court. I'm going to turn right to your point about the audits, the prior audits. There was one done in Peru, but it was not an audit to compare community A versus community B, and that's really the issue in these audits. There were three prior audits that were discussed in the evidence. None of them addressed the issue of Forest View versus Peru versus Burr Ridge versus DuPage County. What those audits concerned were in the DuPage County situation was the question of place of sale versus place of delivery, and there were some stipulations made, but there was no investigation done of one office versus another for place of sale purposes. In the second audit that occurred, it was a waste oil audit. The question was it was a criminal investigation whether Hartney was using waste oil in a way that violated the MFT tax laws. There was no finding whatsoever about place of sale in that particular audit. In the third audit, the Peru audit, all they looked at, and there's testimony in the record about those sales that occurred and whether or not taxes were paid on those sales. So none of those prior audits looked at the issue that we're concerned with here, community A versus community B, for purposes of place of sale. Now, also I would add, and counsel was getting to it and ran out of time, is the issue of estoppel. Even if we look at these prior audits, the issue of estoppel does not run against a public body for public revenue purposes. This court, the third district, has made that ruling on several occasions. We've cited the cases in our brief. In addition, not only have you made that ruling, but the Supreme Court of Illinois has found that on several occasions too. So the prior audits cannot be an estoppel against my clients or Mr. Burke's client. Let me turn now to talk about the blanket contracts. They're also called long-term or requirements contracts. And it is a very significant part of this case because over one-half of the volume of Hartney's fuel sales for the time period in question, $12 million was in blanket contract sales. And the court's conclusion that blanket contract sales have a cytosine mark is simply not supported by the record or by the law. The regulation that applies here, and there's a specific regulation, as you know, that applies to blanket contracts, is quite clear. And it makes the location of the signing of the master blanket contract absolutely irrelevant. Here, that statute, that regulation rather unquestionably applies. The subject blanket contracts do not specify when deliveries are to be made or how much fuel is to be delivered at any time or even in total. So how is it this system worked? Nothing was due, the testimony shows that nothing was due from the customer money-wise when the contract was signed. Nothing was due until fuel was actually delivered to the customer. ETI, and this is really important I think, under contract not to Hartney, but ETI under contract to the customer and as an agent of the customer, checked customer tank levels and when they got to a certain level would go out to a terminal in a prearranged situation with Hartney, pick up fuel delivered to the customer and send the paperwork then to Hartney for Hartney to bill the customer. So in essence, it's tantamount to an order. What ETI did as the agent of the customer was to show up, determine that fuel was required, draw down that fuel, and then run the paperwork through Hartney. As I said, it is absolutely tantamount to what an order is. And note that Mark was not involved in any way in this transaction. Only Hartney's office in Forest View was involved with the actual subsequent ordering and delivery of fuel. Now Hartney argues to you that the location of the signing of the contract is controlling if there were subsequent orders. I would suggest this is legal sophistry because the contracts themselves don't say when or how much fuel is to be delivered at any time and no fuel is going to be delivered if nothing is done. There has to be a subsequent order and it occurs when ETI, acting on behalf of the customer, goes to the terminal, picks it up, and then sends the paperwork to Hartney. Mr. Berge, can I back up a minute? Again, both you and Mr. Berge talked about whether there's an estoppel against the agency. Well, is this necessarily an all or nothing proposition? Can the finder of fact use these prior audits not as an estoppel but maybe as, in his mind, determining whether the department is being less than genuine about their position? Well, Your Honor, I would say if they were factually relevant, they might have some relevance to looking at a similar situation. But again, there was never a situation where the department was looking at the issue that's involved here, place A versus place B. If it was a situation where it was Mark versus, say, Peru or Mark versus original life, one might make that argument. However, I would point out that in the Sacco case, which is one of the cases that we cited, one of your third district cases, the court specifically said that even comments made by department employees would not be binding upon the department if facts were later found out that were different. So again, binding, but I'm just saying, are these things that the finder of fact can consider when judging the department's position? Well, I think that the finder of fact can consider whatever the finder thinks is appropriate. What I'm saying, Your Honor, and I'm not being flippant with your question, I'm saying here, I think the mistake that was made respectfully by Judge Schor was in not recognizing that there never was an issue that was placed before, you know, community A versus community B in terms of place of sale. It would be easy, for example, let's take the Duke case. Then was there objections to the relevance of all this testimony about these prior audits? Oh, yes. And was it? On several grounds. At the outset on estoppel grounds, there was also discussion, a lot of discussion, both in the trial court and in the briefing about what actually happened here and the fact that they were not relevant to this situation. Judge Schor concluded otherwise, and I think he corrected himself. Continuing on with respect to the blanket contracts, a few points I want to make. If we abandon the specific regulation that deals with blanket contracts and says that doesn't apply, if it applies, there's only one result, and that is that the trial court was wrong. And by the way, this is a discreet issue in this case. The court has the option of reversing just on blanket purchase orders if it wants to. I think it should reverse on everything, but you could just reverse on this issue. But let me say that if we get out of the issue, get out of the regulation about blanket contracts, we're left with the rest of the regulations that apply. They talk about purchase orders and where purchase orders are accepted or centered or the like. In the blanket contract situation, there were no purchase orders. And so to the extent that it talks about purchase orders, the rest of the regulation does, it gives us no guidance whatsoever. To the extent that Hartley says to you, well, let's just look at where the master contract was signed, there is nothing in the statutes and there's nothing in the regulation that ever says that you look simply to where contracts were signed. And even if there was, it's admitted in the testimony that some of the contracts were signed. Mark, some were signed in Fortisview, some were signed in the customer's offices. So that leads nowhere either. There's only one possible result. Let's do reverse on the blanket contracts. Are these what would be called requirements contracts? Yes, ma'am. Yes, Your Honor. So the contract, the fundamental contract is the sale. What's needed at any individual time spins off of that contract, but the contract itself is the sale. The contract itself is only part of the sale because it does not define how much is going to be purchased and at what time or the price. It sets a threshold saying you will purchase, let's say, 100,000 gallons over this time period, but it doesn't say it will be on this date at this price or that you're limited to 100,000 gallons. But it does say that any oil or fuel that I need I will purchase from you. Your Honor, I don't know that it says I have to purchase all my fuel. It's a requirements contract, but I'm not – I would have to look at the contract, and honestly, I don't recall as I stand here now. But the point is that under the regulation, it says clearly that that master contract is not the contract that you look to in determining the site is the sale. Rather, you look to where the specific order is replaced. So that regulation throws out the location of the blanket contract that applies. I'd like to turn to public policy for just one minute, and I have one. It's not difficult to see what the public policy implications of the trial court's decision are, if affirmed. Retailers and non-cash-and-carry businesses across the state will do exactly, exactly what Hartney has done. They'll go to low-tax communities and set up a storefront or set up a hotel room where someone will be sitting, whether it's their employee or an independent contractor, answering phones on their cells. And those communities won't themselves get all the revenues. What's going to happen is what happened here to Mark. They're going to be forced to pony up about 85 percent of their local share back to the retailer. And even the communities that these folks move to won't be safe, because from year to year to year, they will move to a community that offers them the best deal for their storefront or their office. And they can easily move because we're just talking about a lease of some space. Now, the – and you can see that happen here, because what Hartney did was they moved from Burridge to Peru and then eventually to Mark. Just 40 seconds, if I could. Meanwhile, what's going to happen is that the communities where these retailers are truly located, like Forest View, are going to be losing millions in tax dollars that they need to provide basic services. Police, fire, streets, infrastructure, and – I'm sorry. No, no, go ahead. Finish your – I'm sorry. And the point is Forest View is a community of 800 people. Mark is a community of 500 people. Forest View, with 800 people losing all these tax dollars, still has to provide police and fire and all this to Hartney. When Hartney's over here making his – Well, okay, let's – I get your point a little bit. Let's talk about public policy real briefly. Are you saying high taxes are good for – that's good public policy? And wouldn't you suggest that maybe if Forest View had the same tax structure that Mark had, Hartney wouldn't have moved? Well, you know, that is possible. However, if you want to live – if you want to be in Chicago and in Cook County, you pay the taxes that exist there. What I'm saying is let's not do shams here. If you want to live in Mark – and Mark's a beautiful community – if you want to live there, fine. But don't be in Forest View and Cook County and say, well, I want to be in Cook County. I want to pay the taxes in Putnam County. And what I would say – Well, there are employees there buying lunch and they're spending money in that town too. I don't think – see, if you don't like our tax structure, stay out of our town. Is that the argument? No, no. Put a business there. Put your business truly there. There's nothing wrong. And we would say that there's nothing wrong whatsoever with the business moving to Mark and operating out of Mark. But here, where the selling activity and all the employees and everything that they do is in Forest View, don't pretend now that you truly are conducting selling activity in Mark. You raise selling activity, price, the issues of price, customer selection, credit terms, payment terms, customer complaints, accounts receivable. All that selling activity is taking place in the Chicago area, not down here. So my point is, I'm with you. I don't like necessarily paying high taxes either, Your Honor. But I realize that if I'm going to reside in one jurisdiction, I pay the taxes there. That's the way the system works. And let me conclude with this. Unless you have another question, let me conclude with this. This is a case of statutory and regulatory interpretation. If this court believes, as I do, that the scenario that I've described of businesses really being in one community but having a little satellite hotel room in communities around the state, if you believe, as I do, that that cannot be what was intended by the legislature in setting this up, then the interpretation of the statute is diametrically different than what Hartley is pleading for. The result that Hartley is pleading for, where companies move around the state office-to-office, never having an employee but just having hotel rooms, is a disturbed result. Let me ask you to move forward. Thank you. All right. Thank you, Mr. Berkey. Mr. Hochman. Thank you. Thank you, Your Honor. If you may please, the court brought Hochman on behalf of Hartley Jewelry. I'm going to start with the statute and the regulations. Mr. Berkey mentioned at the end that that's really what this case is about, and I think that one of the things that's hiding in this case, or at least that the appellants are trying to hide in this case, is the clear answer that exists in the regulation. Now let's start with the statute and the cases that they cite, Automatic Voting Machine, Accelo, International Stanley. The fundamental problem of this case and their reliance on all those authorities is that the statute and those cases answer one question, but it's not the question that actually matters in this case. That answers the question. The statute uses the phrase engaged in the business of selling. It's not actually the occupation. It's not where your business, where your corporate headquarters is located. It's an activity, and what those cases say is that can be a variety of things, the business of selling, and what the statutory language and the first part of the regulation, which follows those cases, allows is the possibility that there's more than one place where you're engaged in the business of selling. This is hardly surprising. There are companies that have lots of places where they're engaged in the business of selling, and the issue in those cases wasn't how do I choose between which place? It was simply a question of whether they're engaged in enough business activity in Illinois to be subject to tax in Illinois. Those cases had nothing to say about whether those companies were engaged in the business of selling in New York or any other state. Just interested in are you engaged in the business of selling in one place. Here, there are two places at issue. Forestview and Monk. The statute and those cases don't tell us a thing about how to answer the question of which one, and there can only be one for purposes of the retailer's occupation tax, where the sales would be located. For that, you have to turn to the regulation and another part of the regulation, and it's titled Seller's Acceptance of Order. And this is the second step, and this is really where this case turns. Now, Mr. Burks read you the first sentence, and we admit there's three sentences to this critical provision. The first one says just what he said, that the place of acceptance is going to matter most. It's the most important factor. It doesn't say it's decisive. That sentence doesn't say it's decisive. But then the next sentence, the one that appears nowhere in their brief, the one that the interveners actually excise from the statute in their quotation brief with an ellipsis, it says this, and I'm going to read it. If the purchase order is accepted at the seller's place of business within the county or by someone who is working out of that place of business, the seller incurs home rule county retailers' occupation tax liability in that home rule county. Unequivocal, clear, unambiguous, and decisive. The first sentence says the place of acceptance is going to matter most. The second sentence says it matters so much that when it's clear where order acceptance occurs, that's decisive. We're done. And then the third sentence reinforces the point. It says we want this to be clear, so we're going to establish an evidentiary presumption. If you receive a purchase order at a particular location, we're going to presume that that's where acceptance occurred. With a factual background, am I clear in thinking that the record in this case shows that the MARC office served as a mailbox, correct? I wouldn't call it a mailbox. I would call it a checkout counter. They had a fax line for Hartney, and there was an order taker who would take orders from customers, fax those orders to the main office in Forest View, to the office in Forest View. No, that's an important factual error. That last point is not correct. They did fax orders to... Here's what I think is important, Your Honor, on that point. Here's what happens. So an order comes in, whether it's a long-term purchase order or a daily purchase order. There's a slight difference, and I'll try to distinguish between the two. Let's start with the daily purchase orders. An order comes in. Somebody calls up or they fax it, but they call up and they say, here's the kind of fuel we want, here's how much fuel we want, here's when we'd like it delivered by. The only person acting on behalf of Hartney Fuel Oil, whoever gets that information before Hartney becomes bound to sell the fuel, is Lori Seraiso in Mark. That's it. When she picks up the phone to call Forest View, she is not calling Hartney Fuel Oil. She's calling Energy Transport, a separate company. Judge Shore pointed that out. And so what she's basically doing, if you imagine in legalese, a phone call that goes on to Forest View, she's calling, again, she's saying, Hartney Fuel Oil, she's calling Energy Transport, and she says, Hartney Fuel Oil has just sold fuel to Sell and Sell. Please deliver it. That's all she's doing. So no one at Hartney Fuel Oil in Forest View ever has to deal with that order before Hartney Fuel Oil is bound and actually made the sale. As to the daily purchase orders. Right. And then as to the… No, but the checkout counter, someone at a checkout counter doesn't negotiate sales either. And, in fact, there isn't the evidence on the daily purchase orders. There's no negotiation at all. There's just a price sheet. It's like putting out something, putting out a product on a shelf with a price. You walk up to the counter, you don't… She doesn't deal with financing. No, but the checkout counter, you don't deal with financing either. Somebody at corporate headquarters decides what credit cards to take. This isn't so out of the blue. This isn't so crazy. Was she aware of the prices? The evidence is that she did not know the prices. But she took the orders and she was bound. She had the ability and, in fact, the authority to bind Hartney to the sale. What was her connection with blanket sales? With blanket sales, she received the long-term purchase contracts in March. On occasion, if Mr. Hartney hadn't signed the order and hadn't signed the contract first in March, then if she received a long-term purchase order from the customer, Mr. Hartney would come to Mark and sign there. But, again, she kept the copy. She forwarded the copy off to Hartney Fuel Oil, but nobody disputes that if that copy that she forwards on to Forest View gets lost in transit, that Hartney hasn't made the sale, that Hartney isn't bound by the terms of that contract. And, by the way, that is a purchase order. Those long-term contracts, Your Honor, were sales that included minimum amounts of fuel to be purchased. Those were purchase orders. They were long-term purchase orders, and they paid a fixed price to a formula based on movements in the market, but they're purchase orders nonetheless, and they're governed by the same regulation that I began discussing. So I think the regulation is absolutely clear that the place of acceptance is controlling, and I'd like to say that the interpretation that I've provided, reading from it, is somehow a clever reading that I've imposed, but it's not. It's the reading that comes forth from everything that's legitimately before you to determine what this regulation means. What did the audit manual tell the department's auditors, whose job it is to implement this provision, say? It says fix the situs of the sale where the purchase order is accepted. What do the PLRs and the GILs, all the things, again, that the department has reviewed, what do they say? They get long descriptions of complicated mechanisms of the way businesses are run. Surely there's a whole bunch of different ways companies can organize themselves, and at the end of each of these, year after year after year for decades, you get the same kind of ritualistic incantation. If a purchase order is accepted in a jurisdiction, that's the location where the tax applies. The auditor, in this case, if you look at the audit narrative, the last page, it appears she even began looking for where purchase order acceptance occurs. And Your Honor, as to prior audits, if you look at the Burr Ridge audit in this case, I understand that they have distinctions, but the Burr Ridge audit in this case was about all of the audits, in fact, where purchase order acceptance occurs matters. In the Burr Ridge audit, they say, oh, but there was no dispute over this county or that county, or there was just a factual stipulation, so nobody was trying to figure it out. But what did they stipulate to is what matters. The only thing that they stipulated to was the place of purchase order acceptance, because that's all that matters. And they say, oh, but it was the motor fuel tax. It wasn't the retailer's occupation tax. Well, look at the statute in the motor fuel tax. It's 55, ILCS 5-5-1035.1. It uses the exact same language engaged in the business of selling. And the regulation under the motor fuel tax, 86 Illinois Administrative Code 695.115, is verbatim the regulation in this case in structure and terms. In other words, in the Burr Ridge audit, under the exact same language and the exact same standard, the only thing that they wanted to stipulate to, the only thing that they cared about, was where do you accept your purchase orders. Your Honor, again, it's not just that we're making this up. It's not just that we're trying to figure out a way to implement this statute. This is the way it's been done all along. And what the appellants put before you is a series of shifting, standardless factors that nobody has any idea how to apply because it's never been articulated before. It's the invention of lawyers in this case, Your Honor. They come from nowhere else. To the extent that they're teased out of their cases at Sello Automatic Loading Machines, as I said at the outset, those standards were developed to answer a different question. Not which county, but whether you're anywhere. Whether you're in one place, three places, or five places. And in fact, at the outset of this case, Mr. Bertschy stood up in his opening. He went through, I don't know, you can slice and dice it however many ways you want. He went through 13 factors, it seems to me, that he thought were relevant to determine where to locate the sale. And which one wasn't among the 13? Where the purchase order was accepted. Despite the fact that there's a provision in this regulation that says, seller's acceptance of order. And, Your Honor, I want to just be clear about one thing about the regulation. With respect to long-term purchase orders, the same standard applies, unless the specific provision about long-term purchase orders changes the rule only if there are subsequent specific orders. And the notion, the notion that energy transport is placing subsequent specific orders when it determines on its own how much fuel is needed, provides the fuel, and then just lets Hartley know after the fact, blows the notion of requirements contracts wide open. This is a standard UCC requirements contract. There's no subsequent purchase order. There's no subsequent specific order. They're just being given what they need. Your Honor, I don't want to make too much of it, and I think, Justice Carter, I understand where your questions were headed, but I want to emphasize how really not, I think, unusual, and how not shocking this result should be. You don't walk into a Hartley store to buy fuel. And it's true, there are lots of things that Gloria Serra said doesn't do, but those are exactly the sort of things that a lot of businesses that have retail stores don't have their checkout people do. They don't negotiate prices. You don't walk into a Walgreens and pick up a bottle of Tylenol and say, I see this one, this one's $10. Can you give it to me for $9.50? No, you don't negotiate price. Walgreens decides, corporate headquarters decides what credit cards to accept, what credit. The checkout person doesn't decide that. Walgreens and corporate headquarters set prices, not particular stores. And sales offices don't purchase supply. Stores don't purchase their own supply. Corporate headquarters does. So calling Sarasa, in many ways, is really no different from walking up to a counter in Mark, presenting what's the equivalent of a Hartley-issued credit card because you're pre-approved, and walking out with a binding order for fuel. That's all that's going on. Your Honors, I just want to conclude. I want to draw your attention to a case decided just two days ago in the U.S. Supreme Court. It's called Christopher v. Smith. And we can submit it to Your Honors if you'd like. But I'm sure you can get it. The case dealt with the Department of Labor regulation. And the Supreme Court had the job of interpreting that regulation. And they went at it their way. Before you go on, this case isn't in here. No, it was decided just on Monday. Okay. Well, my suggestion is then, I don't think it's fair to argue that case at this point. Well, then I won't argue. If you want to cite it and add supplemental authority, we'll give you 14 days or 10 days and then give your opponents. I'd be happy to do that. But if I may, I'll just refer to the basic principles because I think they're true. All I want to do is illustrate certain basic principles that I think are true regardless of whether the Supreme Court says so or not. I think it's helpful that they do. But the issue talks about the issue in administrative law in many cases has to do with what do you do with an agency's regulation and an agency's interpretation of its own regulation that deviates from its past practice. And that's what's going on here. What do you do with that? Well, in a lot of cases you'll see that the issue of unfair surprise or inadequate notice is raised. And courts don't give any deference, don't give any respect to agency interpretations of their own regulations that reflect the kind of change in direction. And that's true even when the agency regulation at issue is ambiguous. I would put forward that here it's the worst kind of case for that kind of showing respect for the agency's interpretation of its regulation. Here what you have is a very clear regulation. What I just read answers the question. No doubt about it. The only thing that's ambiguous in this case is the kind of seat-of-their-pants shifting standards that the lawyers have developed to try and snare Hartney in this task. They can't agree amongst themselves what the standards should be. In fact, I think I heard a new one this morning. Mr. Burks, I think, said, well, what matters really is you should look at where the retailer benefits from local government services. That's a new one. Here we have another fact. They keep popping up. Instead, Your Honor, this is beyond the kind of ordinary inadequate notice, an unfair surprise that ought to get no respect from a court. I would submit it's a flat-out violation of due process, and it's certainly an affront to the well-established methods for enacting new legislation or amending a regulation. They have a problem with this regulation that they've written that's clear that they've been applying for decades consistently. Submit an amendment, put it up for notice in comment rulemaking, and we'll have at it publicly. Or go down to Springfield and try to amend the legislation. We can have at that, too. But what you don't do, what you don't do is ensnare a company like Hartney in a whole new regulatory standard invented, sprung on them in the midst of litigation long after the sales and the pricing decisions were made in this case. That's inadequate notice. That's unfair surprise. And frankly, we submit it's not law. For this reason, we request that you would affirm the judgment of the trial. Thank you, Your Honor. No questions? All right. Mr. Burks, some rebuttal? Mr. Burks, he and I are going to be sharing rebuttals as well, so I only have a couple of minutes, and I'll try to make a few brief points or answer questions, either one. But the first point I want to make is the Walgreens checkout counter. In a Walgreens checkout counter, you have all the inventory, you have all the customers, you have all the shipments. They all come on the roads where that Walgreens is located, and all of that selling activity is occurring there, and all of the services are being provided by that local community, that the infrastructure that enables that Walgreens to exist, and the local retailer's occupation tax then applies at that location. So you don't have this pass-through structure that you have with Hargate. You have customers, inventory, deliveries, sales, personnel, employees, all occur at that location. So for a retail sale, the occupation of selling does take place where the sale takes place at a retail sale. But this is not a sales tax. It's not a tax on the sale. It's a tax on the occupation. One point I wanted to make on checkout counters. As to Justice Carter's question, she was faxing it back to Forest View, and counsel said, oh, no, she wasn't faxing it to Hartney. She was faxing it to Energy Transport. Same phone number, same employees, same personnel. She doesn't say, oh, can I talk to somebody from Energy Transport? She sends it. She says, I've got deliveries from Hartney. So the idea that, you know, I think counsel called it legalese. You have to understand legalese to understand their argument that these weren't just pass-through orders. You have to understand the legalese that they were being passed through to some separate entity with the same phone number, same location, same employees, same officers. The Hartney brothers own them both. So I think Justice Carter's kind of analysis or assessment of the facts is in substance accurate, you know, and it won't take my limited time to dispute whether in legalese it was accurate. My third point is this idea that the regulation determines which of two viable locations, and as counsel points out, you can only have the retailer's occupation tax in one location. But if they're right and the order acceptance is dispositive, you can excise the rest of the regulation. You don't need it for anything. All you need to determine is where is the local jurisdiction in which the order is accepted. And the first section that talks about enough selling activities, well, per se, accepting the order is apparently enough selling activities because according to their reading of the regulation, it's a one-factor test. It's a black-letter test. Thank you. Thank you, Mr. Burks. Thank you. I had to smile a bit when opposing counsel said that our side was creating inventions for lawyers because if there ever was an invention of a lawyer, this sales scam is an invention of a lawyer. Well, why is it a scam when they move to try to minimize their tax? There wasn't any reasonable businessman trying to do that. The point is they didn't. They did not move. No employee was in Mark. Everything that they did, selling activity, setting of prices, counsel said no one dealt with the order in Mark. And the fact is, yes, they did. The order is all about what's the price going to be, what are the credit terms, what are the payment terms, who approves the customers who didn't even have customers. And Laurie Cerise was quite clear. I didn't even know what the price was. I didn't know who the customers were. All I could do was accept. She couldn't even reject people when they called her on the phone, except if they weren't on the list. The point here is this feels wrong, and it is wrong. And what I'm asking this court to do is not allow your common sense to be handcuffed by what is a fiction about selling activity. If you were to say to anybody, where is Hartley? Where is Hartley Fuel and where is it conducting its activity? It would say Forest View. It would say Forest View. If you asked the customers, they'd say Forest View. All they know is they call a number. They don't know where that number is. They don't know where that fax is. And if we talk about selling activity, that's what we're talking about. And then when counsel says, well, the rules and regulations say this, I would caution the court to read the rule carefully. And I know it will. But it says, without attempting to anticipate every kind of fax situation that may arise in this connection, it's the department's opinion, that generally so-and-so. They have tried to set up rules for companies that legitimately have offices in different parts of the state. Take Caterpillar. It's got an office in Aurora. It has stuff in Aurora. It has Peoria County, Tazewell County, and the like. It legitimately does business there. And so this rule gives them guidance as to where their sale sites will be when activities related to a sale take place in different communities. It's not directed to a situation where someone is doing what Hartley is doing. And that's what it starts off by saying. Counselor, your time is up. Can I finish? That's why it says, without attempting to anticipate every kind of fax situation. They've protected themselves in this way. And that's what the 2005 PLRs are all about. And I suggest we did give notice. That's right in the time period that we're talking about for this audit. Thank you very much. Thank you, Mr. Bertree. All right. Thank all of you for your arguments here this morning. This matter will be taken under advisement. Written disposition will be issued. Right now the court will be in a brief recess for a panel change.